IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL EVANS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED PARCEL SERVICE, INC., and )<br>TEAMSTERS LOCAL UNION NO. 705, )<br>)<br>Defendants. ) | Case No.  19 C 4818<br><br>Judge Robert W. Gettleman |

## MEMORANDUM OPINION & ORDER

Plaintiff Michael Evans alleges that defendants United Parcel Service, Inc. ("UPS") and Teamsters Local Union 705 ("Union") conspired to deprive plaintiff of his entitlements under the Collective Bargaining Agreement ("CBA"), discriminated against him on the basis of his race, and retaliated against him for filing grievances by preventing him from working extra shifts. After ruling on defendants' motions to dismiss, the following counts remain: Count I, asserting that defendants breached their duty of fair representation and violated the CBA, under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, et seq.; Counts II and III, asserting race discrimination and retaliation, under 42 U.S.C. § 1981; and Count VI, asserting a violation of the Illinois Whistleblower Act, 740 ILCS 144, et seq. ("IWA"). Both defendants have moved for summary judgment. For the reasons stated below, both motions are granted.

## BACKGROUND

I.  **Local Rule 56.1 Issues**

As a preliminary matter, plaintiff and the Union did not bother to include a statement of material facts section in their briefs, electing instead to leave it to the court to sift through the

1

parties' Local Rule 56.1 statements and the underlying exhibits to determine the factual background and sequence of relevant events. The briefs submitted by plaintiff and the Union assume the court is as familiar with the underlying events as the authors, jumping straight into legal argument without providing sufficient background information. Courts in this district have repeatedly informed litigants that a Local Rule 56.1 statement is not a substitute for a statement of facts section contained in the supporting brief. See e.g., Flakes v. Target Corp., 2019 WL 6893005, at *2 (N.D. Ill. Dec. 18, 2019); FirstMerit Bank, N.A. v. 20000 N. Ashland, LLC, 2014 WL 60605817, at *4 (N.D. Ill. Nov. 13, 2014); Duchossois Indus., Inc. v. Crawford & Co., 2001 WL 59031, at *1 (N.D. Ill. Jan. 19, 2001) ("Counsel obviously fail to understand the purpose of L.R. 56. L.R. 56.1 statements are not intended to be substitutes for a statement of facts section of a memorandum of law. Rather, their purpose is to assist the court in identifying those material, uncontested facts in the record that entitle the movant to judgment.").

Plaintiff additionally failed to comply with Local Rule 56.1 in several respects. First, plaintiff filed only a response to defendants' statements, without filing his own statement of additional facts as provided by Local Rule 56.1(b)(3). Instead, plaintiff "smuggle[d]" new factual material into his response to defendants' statements, Phillips v. Allen, 743 F.Supp.2d 931, 936 n.1 (N.D. Ill. 2010), which "unfairly deprived Defendants of a vehicle under Local Rule 56.1 to dispute those facts," Johnson v. County of Cook, 2012 WL 2905485, at *13 (N.D. Ill. July 16, 2012). Further, many of plaintiff's responses fail to cite to the record at all, and the few citations plaintiff does include do not support plaintiff's claims.[1] In addition, plaintiff misnumbered many of the paragraphs, make the court's job that much more difficult.

---

[1] Plaintiff's response briefs similarly cite to almost no legal authority. Indeed, plaintiff's briefs contain exactly six (6) citations to authority, all of them for the summary judgment standard.

Finally, plaintiff attached his own declaration to his summary judgment brief. The declaration is undated, and is thus inadmissible under 28 U.S.C. § 1746; Sheikh v. Grant Reg'l Health Ctr., 769 F.3d 549, 551 (7th Cir. 2014). Even if the declaration was dated, many of the statements within the declaration contradict plaintiff's deposition testimony, and are otherwise conclusory or speculative.

## II.     Background Facts

The court can discern the following facts, as labyrinthine as they may be. UPS hired plaintiff, who is African American, in December of 1999. In 2005, plaintiff began working as a part-time PM Air Driver. His employment is governed by the terms of the CBA between the Union and UPS. The CBA has several relevant provisions. Article 40 governs the salary rates for Air Drivers. Article 40 states that the workweek for part-time Air Drivers "shall be five (5) in seven (7) days," and that part-time Air Drivers "shall have a three (3) hour daily guarantee. They shall receive overtime pay for hours worked in excess of eight (8) hours in a twenty-four (24) hour period or in excess of forty (40) hours per week." Article 40 further states that Air Drivers who work on Saturday or Sunday "shall be paid in the air driver's straight time rate of pay…. Time and one half shall be paid after eight (8) hours per day or after forty (40) hours per week."

The CBA has a separate provision governing full-time employees, which all parties agree plaintiff was not. That provision of the CBA, Article 46.1(a), states that the "straight time work week for all employees shall consist of five (5) days, Monday through Friday inclusive… of eight (8) hours each, with time and a half to be paid for work performed on Saturday…." Both UPS and the Union assert that Article 46.1(a) does not apply to plaintiff, because it only applies to full-time employees and plaintiff was a part-time employee. Plaintiff believes that this

3

provision applies to him, and had frequent meetings with the Union and UPS representatives over this applicability of this provision.

The CBA further governs which employees can do certain types of work. For example, UPS managers are discouraged from using Air Drivers for "ground" work, and must pay a penalty in the form of a higher pay rate to use Air Drivers for such work. When extra ground work is available, it must first be offered to Package Car Drivers, then 22.4 Combo Drivers, Full-Time Air Drivers, part-time AM Drivers, and finally part-time PM drivers, and then in order of each individual employee's seniority. As defendants note, this means hundreds of employees have the option to accept extra ground work before that work is offered to plaintiff.

UPS guarantees part-time Air Drivers, like plaintiff, 15 hours of work per week, and plaintiff admits that UPS always gave plaintiff at least 15 hours of work. Plaintiff's guaranteed hours are scheduled between Monday and Friday. However, on occasion, plaintiff would pick up extra shifts on Saturdays. Overtime work on Saturdays was colloquially referred to as "sixth day pay."

At some point, plaintiff became convinced that he was entitled to overtime pay (time and a half) for all work done on Saturdays—regardless of whether he worked 40 hours that week or eight hours that day. In late 2017, plaintiff began requesting payroll adjustments to receive time and a half for all hours worked on Saturday, even when he had not yet worked 40 hours that week. Many of these requests were granted, but UPS asserts they were granted in error.[2] In early 2018, UPS Senior Management realized that plaintiff was requesting payroll adjustments that he was not entitled to, and began denying his requests.

---

[2] UPS accuses plaintiff of finding the one manager who would grant these requests in error, and then seeking to exploit that error through the filing of dozens of grievances, administrative charges, and ultimately, a federal lawsuit.

4

Starting in April 2018, plaintiff filed dozens of grievances with the Union regarding his sixth day pay. Plaintiff claims that at one point union steward Kevin Gloria informed plaintiff that he was entitled to sixth day pay for his work on Saturdays. However, when plaintiff spoke with Union officials higher up the chain, such as Union Trustee Scott Rein and Union Secretary Treasure Juan Campos, they all emphatically claimed that plaintiff was not entitled to sixth day pay unless he worked more than 40 hours that week or eight hours that day. They also repeatedly explained that Article 46.1(a) does not apply to plaintiff because plaintiff is a part-time Air Driver, and that Article 40 applies to plaintiff. The Union chronicled dozens of meetings, letters, phone calls, and text messages with plaintiff discussing the terms of the CBA, and explaining that plaintiff was not entitled to sixth day pay unless he worked more than 40 hours that week. Plaintiff admits that he does not know of any other part-time PM Air Driver who received sixth day pay without working 40 hours. He further admits that when he worked over 40 hours a week, UPS paid him overtime, as per the CBA.[3]

The Union withdrew some of plaintiff's grievances, believing them to be without merit, and failed to file some others for the same reason. Plaintiff had several meetings with Union Trustee Scott Rein and UPS Labor Manager Chris Opperman about his concerns. Opperman investigated plaintiff's original payment requests and determined that plaintiff had been overpaid. UPS claims that in similar situations, it would normally seek repayment for the amounts the employee had been overpaid. However, Opperman declined to seek repayment from plaintiff at Scott Rein's request. Plaintiff claims that Opperman was rude to him in these

---

[3] Although not a basis for any of his claims, plaintiff believes that if he worked 5, 9-hour days for a total of 45 hours, he would be entitled to 10 hours of overtime pay because he would be entitled to 5 hours for the time he worked over 8 hours per day and 5 hours for every hour he worked after 40 hours. In the same scenario, UPS and the Union believe plaintiff would be entitled to 40 hours of straight time and 5 hours of overtime.

5

meetings and would interrupt him, although plaintiff admitted that Opperman treated Rein, a white man, the same way.[4]

In addition to grievances over pay, plaintiff filed grievances because he was offered fewer ground work shifts. Plaintiff believed UPS was violating the seniority rules by offering theses shifts to employees with lower seniority than plaintiff. The Union represented plaintiff on some of these grievances and won settlements, although plaintiff now complains that the Union accepted settlements without his consent (the Union is permitted to do so), without seeking penalty payments, and didn't get the full amount plaintiff requested. UPS also puts forth numerous facts regarding its restructuring of employees that resulted in less ground work for <u>all employees</u>, not just plaintiff. For example, UPS compensated for increased package volume on Saturdays by shifting the full-time work week from Monday-Friday to Tuesday-Saturday; hired over 100 new 22.4 Combo Drivers; and noted that full time ground drivers filed grievances complaining about part time Air Drivers picking up ground work. Plaintiff admits that several of his seniority grievances were properly withdrawn because they included days when plaintiff was on vacation or because it was a duplicate of another grievance.

Plaintiff proceeded to file complaints with administrative agencies, including two EEOC charges in November 2018 and April 2019, two complaints with the Illinois Department of Labor in 2018, and an NLRB charge against the Union on June 28, 2019. All of the administrative agencies dropped the charges.[5]

---

[4] Plaintiff further admitted that Union stewards generally regarded Opperman as a "prick."
[5] For the EEOC charges, the EEOC investigators noted that plaintiff admitted that he didn't make any claims protected by laws enforced by the EEOC. The Illinois Department of Labor dismissed the charges because plaintiff falls under the Motor Vehicle Carrier Exception and is thus not subject to the relevant act. And finally, the NLRB dismissed the charge, determining that "the evidence is insufficient to prove that the Union refused to process [plaintiff's] grievance for unlawful reasons."

In February and March 2020, plaintiff filed grievances alleging that Union official Scott Rein and UPS Manager Chris Opperman retaliated against plaintiff for filing grievances by offering plaintiff fewer shifts. The Union withdrew these grievances. Plaintiff further alleges race discrimination, pointing to the fact that Opperman would interrupt plaintiff in meetings and was rude to plaintiff, and that a supervisor gave plaintiff a broken cart one day, in support of his claim. UPS asserts that it was unaware of the administrative charges until well after this lawsuit was filed.

## DISCUSSION

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material facts exists if "there is evidence such that a reasonable jury could return a verdict in favor of the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." See CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." Grant v. Trustees of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017).

I. **Section 301 Claims**

First, the Union argues that plaintiff's claims in Count I—that the Union violated its duty of fair representation—are time barred. "A duty of fair representation claim has a six-month statute of limitations that begins to run once 'the employee knows or should have known that no further action would be taken on his grievance.'" Buford v. Laborer's Int'l Union Local 269,

7

2019 WL 184053, at *10 (N.D. Ill. Jan. 14, 2019) (citing Lewis v. Dominick's Finer Foods, LLC, 640 F. App'x 529, 533 (7th Cir. 2016)). Plaintiff filed this lawsuit on July 17, 2019, so the relevant incidents would have to have occurred on January 17, 2019 or after.

Nearly all of the alleged conduct occurred in 2018. The record indicates that plaintiff first complained of his sixth day pay in April 2018, and fought with Union representatives over that issue between April 2018 and October 2018. Union representatives sent plaintiff a letter in November 2018 explaining that Article 46.1(a) did not apply to plaintiff, and that he was not entitled to sixth day pay unless he worked over 40 hours that week. Thus, by November 2018 at the latest, plaintiff knew that the Union and UPS would not grant him sixth day pay.

Plaintiff attempts to invoke the continuing violation doctrine by identifying a few meetings with Union steward Dan Ginsbury regarding his sixth day pay from "mid-December" to "mid-January." But the fact that the Union continued to speak with plaintiff about his sixth day pay during late 2018 and early 2019 does not revive his claim or stop the statute of limitations from running. See Christiansen v. APV Crepaco, Inc., 178 F.3d 910, 916 (7th Cir. 1999) (holding that "continued union inactivity after an initial failure to respond to a grievance request does not constitute a continuing violation of the duty of fair representation" sufficient to extend the six-month statute of limitations). And plaintiff's filing of EEOC charges in November 2018 and April 2019 does not toll the six-month statute of limitations. See Johnson v. Artim Transp. Sys., Inc., 826 F.2d 538, 551 (7th Cir. 1987) ("[T]he hybrid section 301/fair representation claim…is independent of a claim under Title VII, and thus the time for filing a section 301/fair representation claim is not tolled by pursuing a Title VII claim with the EEOC.").

The same conclusion follows for claims that the Union retaliated against plaintiff by conspiring with UPS to offer plaintiff fewer ground work shifts. Plaintiff claims that UPS stopped offering these shifts from August 2018 to December 2018. Consequently, plaintiff knew of the alleged loss of work before January 17, 2019.

Even if plaintiff's claims were timely, summary judgment would still be appropriate on plaintiff's Section 301 claim. Plaintiff brings a "hybrid 301" claim, in which plaintiff alleges that his Union breached its duty of fair representation and that his employer breached the CBA. See Rupich v. United Food and Commercial Workers Int'l Union, 833 F.3d 847, 853 (7th Cir. 2016). "The two claims remain interdependent upon each other, so if one claim fails, neither claim is viable." Carcillo v. NHL, 529 F.Supp.3d 768, 784 (N.D. Ill. 2012) (citing Rupich, 833 F.4d at 853). To prevail against either the company or the Union, plaintiff must not only show that UPS's actions were contrary to the CBA, but must also demonstrate a breach of duty by the Union. Rupich, 833 F.3d at853 (citing DelCostello v. Int'l Bd. of Teamsters, 462 U.S. 151, 164-65 (1983)). The Supreme Court has long held that "a union breaches its duty of fair representation if its actions are either arbitrary, discriminatory, or in bad faith." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991).

According to plaintiff, his Section 301 claim "is predicated on the premise that UPS and [the Union] breached the terms of the CBA when they started to deny him extra pay for sixth day work, failed to file grievances within a reasonable time, and retaliated against him for complaining by reducing his hours." No reasonable jury could find for plaintiff on this claim.

First, UPS did not breach the CBA when it failed to pay plaintiff sixth day pay. The plain language of the CBA states that part-time Air Drivers receive overtime pay in two circumstances: (1) when they work over forty hours a week; or (2) when they work more than

eight hours a day. Article 40 further states that for Saturday and Sunday work, "employees shall be paid at the air driver's straight time rate… Time and one half shall be paid after eight (8) hours per day or after forty (40) hours per week." There is no language in the CBA to support plaintiff's belief that he was entitled to overtime pay for all work performed on Saturdays. Plaintiff's reliance on Article 46.1(a) is unavailing because that Article clearly applies to full-time employees, which plaintiff was not. To the extent plaintiff claims that he received sixth day pay and then UPS "changed its mind," the record indicates that plaintiff was never entitled to sixth day pay and received it in error.[6] No reasonable jury could find that the UPS breached the CBA.

Regarding the Union, there is additionally no evidence for a jury to conclude that the Union's actions were arbitrary, discriminatory, or in bad faith. UPS notes that between March of 2018 and February 2021, the Union filed 54 grievances on behalf of plaintiff, 44 of which were resolved. The Union engaged in many meetings, phone calls, and text messages with plaintiff, and Union representatives repeatedly explained the terms of the CBA to plaintiff. The Union also represented plaintiff in several meeting with UPS, won several settlements for plaintiff, and convinced UPS to not seek repayment for the amounts UPS overpaid plaintiff.

Plaintiff complains that the Union did not secure big enough settlements, and that the Union withdrew or failed to file several grievances regarding sixth day pay. These complaints do not indicate arbitrary, discriminatory, or bad faith action by the Union, but rather plaintiff's disagreement and disappointment with the Union's actions. See NLRB v. Allis-Chalmers Mfg.

---

[6] Plaintiff's response brief makes some sort of reliance argument, claiming that Kevin Gloria told him he was entitled to sixth day pay and he relied on the representation to his detriment and continued to work on Saturdays. However, the record indicates that nearly every other Union representative repeatedly informed plaintiff that he was not entitled to sixth day pay unless he worked 40 hours a week or 8 hours that day. Further, UPS paid plaintiff for Saturday work, just not at the rate plaintiff wanted.

Co., 338 U.S. 175, 180 (1967) (an "employee may disagree with many of the union's decisions but is bound by them…The complete satisfaction of all who are represented is hardly to be expected"). Further, the record indicates that the Union withdrew or failed to file the grievances because the Union believed them to be without merit based on the terms of the CBA, which is completely acceptable. See Reed v. Int'l Union, UAW, 945 F.2d 198, 202 (7th Cir. 1991) (a union "may withdraw or settle a grievance based on its good faith evaluation of the merits"). Plaintiff has not demonstrated that the Union's actions were arbitrary, discriminatory, or done in bad faith. The only reasonable conclusion is that the Union diligently and effectively represented plaintiff.

Finally, and as discussed more below, there is no evidence that the Union or UPS retaliated against plaintiff for filing grievances. The record indicates that the Union had nothing to do with plaintiff's scheduling and shifts, as those were handled by UPS.[7] And to the extent plaintiff claims he was picking up fewer ground work shifts, UPS has provided compelling explanations as to why fewer shifts were available.

For these reasons, summary judgment is granted on Count I

## II. Race Discrimination and Retaliation

Section 1981 of the Civil Rights Act of 1866 "protects the right of all persons to make and enforce contracts regardless of race." Oliver v. Joint Logistics Managers, Inc. 893 F.3d 408, 411 (7th Cir. 2018); 42 U.S.C. § 1981. To survive summary judgment on a § 1981 claim, the plaintiff must either provide enough evidence to "permit a reasonable factfinder to conclude that the plaintiff's race…caused the discharge or other adverse employment action," Ortiz v.Werner

---

[7] Plaintiff initially claimed in his deposition that Union Secretary-Treasurer Juan Campos said he was going to tell UPS to stop plaintiff from doing ground work in the mornings. On further questioning, plaintiff stated that Campos said only that he was going to look into it. There is no evidence in the record that anyone from the Union told UPS not to schedule plaintiff for shifts.

11

Enters., Inc., 834 F.3d 760, 765 (7th Cir. 2016), or employ the burden-shifting framework in McDonnell v. Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

Plaintiff's theory of the race discrimination is unclear to the court, but it appears that plaintiff pursues a hostile work environment claim. Plaintiff alleges that UPS discriminated against plaintiff on the basis of his race because: (1) UPS Labor Manager Chris Opperman "cut plaintiff off during meetings and generally treated plaintiff in a disrespectful manner;" (2) UPS manager Torian Farrar (who is black) gave plaintiff a damaged cart to use during one shift; and (3) UPS manager Kevin Majewski asked plaintiff to leave the premises when plaintiff confronted Majewski, and they had a heated discussion. Plaintiff argues that UPS's conduct must be "racist because there is no other explanation for it."

Plaintiff's harassment claim fails because there is no evidence—other than plaintiff's suspicion and belief—that the alleged incidents were related to his race. There record is further devoid of evidence that the harassment was so severe as to constitute a hostile work environment. Indeed, none of the incidents come close to constituting a hostile work environment. First, companies often take adverse positions to employees in grievance meetings, and grievance meetings are often contentious. See Linn v. United Plant Guard Workers, 383 U.S. 53, 58 (1966) ("labor dispute are ordinarily heated affairs…frequently characterized by bitter and extreme exchanges"). Second, plaintiff admitted that Opperman treated Scott Rein the same way, and Scott Rein is white. Third, there is no evidence that Farrar knew the cart was broken or somehow targeted plaintiff. And most importantly, courts have routinely held that isolated incidents such as these are not severe or pervasive enough to constitute a hostile work environment. See Pearson v. Advocate Health Care, 2017 WL 3478815, at *4 (N.D. Ill. Aug. 14, 2017) (finding two to three incidents per year too isolated and sporadic to constitute severe or

12

pervasive harassment); Patt v. Family Health Sys., Inc., 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight comments did not amount to actional harassment and collecting cases).

Plaintiff appears to identify a comparator under the McDonnell framework (without citing to that framework or explicitly invoking it). Plaintiff suggests that UPS discriminated and retaliated against plaintiff because Tracy Carr was able to work more ground shifts than plaintiff, even though Tracy Carr had lower seniority. Seriously undermining plaintiff's argument is the fact that Tracy is black. Further, Tracy Carr was a part-time AM Air Driver, meaning Tracy was a different class of employee than plaintiff and thus entitled to different work. Tracy's classification makes him an unsuitable comparator. Plaintiff also mentions that Zilvinas Ramasaukas, a white man, worked more hours than plaintiff. However, plaintiff admits that every single time Ramasaukas obtained work that plaintiff was entitled to, plaintiff filed a grievance, and the Union obtained a financial settlement in his favor. No reasonable jury could find for plaintiff on his race discrimination claim.

Defendants are also entitled to summary judgment on plaintiff's retaliation claims. To establish a prima facie case of retaliation under § 1981, plaintiff must demonstrate (1) statutorily protected activity, (2) adverse action against him, and (3) a causal link between the two. Oliver, 893 F.3d at 413. Although plaintiff engaged in protected activity when he filed his two EEOC charges, he fails to demonstrate the third element of a retaliation claim.[8] There can be no causal link because the alleged retaliatory behavior—denying plaintiff ground shifts—began prior to plaintiff filing any of the charges. Plaintiff testified that UPS began preventing him from working ground shifts as early as March 2018, and that this carried into the fall of 2018. Yet plaintiff did not file any administrative charges until November of 2018.

---

[8] Plaintiff's EEOC charges reported that he was retaliated against because he was not provided sixth day pay, but they did not complain of any protected conduct within the purview of the EEOC.

There is additionally no evidence in the record that the alleged retaliators knew of the charges until plaintiff filed the instant lawsuit. See Sebastian v. City of Chi, 2008 WL 2875225, at *31 (N.D. Ill. July 27, 2008) ("A decision maker cannot retaliate on account of the protected activity if he is unaware of the protected activity."); Hayes v. Potter, 310 F.3d 979, 982-83 (7th Cir. 2002) ("[I]n a retaliation case, it is not enough that the decisionmaker should have known about a discrimination complaint; the decisionmaker must have had actual knowledge of the complaint for her decision to be retaliatory."). Plaintiff's declaration, which is inadmissible because it is undated, claims that he discussed his administrative charges with one UPS employee, Luis Cardenas. However, Luis Cardenas is not alleged to have retaliated against plaintiff, and there is no evidence that Cardenas discussed the charges with anyone else at UPS such as Chris Opperman. Indeed, Opperman testified that he was unaware of the charges until this lawsuit was filed.

For these reasons, summary judgment is granted for defendants on Counts II and III.

## III.    IWA Retaliation Claim

Plaintiff's IWCA retaliation claim fails for the same reasons plaintiff's claim of retaliation under § 1981 fails. To establish a claim under the IWA, plaintiff must show (1) an adverse employment action by his employer, (2) which was in retaliation, (3) for the employee's disclosure to a government or law enforcement agency,[9] (4) of a suspected violation of an Illinois or federal law, rule, or regulation. Ramon v. Ill. Gastroenterology Group, LLC, 2021 WL 1088316, at *10 (N.D. Ill. Mar. 22, 2021). Plaintiff alleges after he filed charges with the EEOC and Illinois Department of Labor, UPS retaliated against plaintiff by preventing him from performing ground work.

---

[9] The IWA protects only individuals who file complaints to government entities, not internal grievances. MiMidex Group, Inc. v. Fox, 2018 WL 558500, at *9 (N.D. Ill. Jan. 24, 2018).

Plaintiff's claim fails because UPS prevented plaintiff from performing ground work well before plaintiff filed his charges. As noted above, Plaintiff testified that UPS began preventing him from working ground shifts as early as March 2018, and that this carried into the fall of 2018. Yet plaintiff did not file any administrative charges until November of 2018. And again, plaintiff has provided no evidence than any of the alleged retaliators knew of his administrative charges until the filing of this lawsuit. See Sebastian, 2008 WL 2875225, at *31. Consequently, summary judgment is granted on Count VI.

## CONCLUSION

For the reasons stated above, both motions for summary judgment (Doc. 139; Doc. 144) are granted. Civil case terminated.

**ENTER:**

_____
**Robert W. Gettleman**
**United States District Judge**

**DATE:  January 20, 2022**

15